UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,

     v.                                                    22-MR-55-LJV

JAMES P. FOX,

               Defendant-Appellant.

───────────────────────────────

# JAMES P. FOX'S BRIEF IN SUPPORT
# OF RELEASE ON CONDITIONS

**HOOVER & DURLAND LLP**
*Attorneys for Defendant-Appellant James P. Fox*
Timothy W. Hoover
Spencer L. Durland
561 Franklin Street
Buffalo, New York 14202
Telephone: (716) 800-2600
*thoover@hooverdurland.com*
*sdurland@hooverdurland.com*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ........................................................................................ 1

PROPOSED CONDITIONS OF RELEASE ................................................. 2

CITATION KEY .......................................................................................... 4

STATEMENT OF FACTS AND STATEMENT OF THE CASE ................... 5

      A.    Mr. Fox's personal history and background. .................................... 5

      B.    The Government's investigation. ..................................................... 9

      C.    The Criminal Complaint and Mr. Fox's arrest. .............................. 11

      D.    The Probation Office's release recommendation and the Magistrate Judge's detention order .................................................. 11

      E.    Post-hearing discovery .................................................................... 14

ARGUMENT ................................................................................................ 17

    I.    MR. FOX PRESENTS NEITHER A RISK OF FLIGHT NOR A RISK OF DANGER. .................................................................... 17

      A.    The nature and circumstances of the charged offenses supports release. ............................................................................. 17

      B.    The weight of the evidence regarding the charged offenses supports release. ............................................................................. 18

      C.    Mr. Fox's history and characteristics weigh in favor of release ............................................................................................ 21

      D.    There is no danger to anyone if Mr. Fox is released ....................... 23

    II.    THE GOVERNMENT DID NOT AND CANNOT PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE MR. FOX'S APPEARANCE. ........................................................... 24

    III.    THE GOVERNMENT DID NOT AND CANNOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE SAFETY OF THE COMMUNITY. .......................................... 31

IV.  PRETRIAL DETENTION HAMPERS MR. FOX'S ABILITY TO
PARTICIPATE IN HIS DEFENSE. ................................................................. 33

CONCLUSION ........................................................................................................................ 33

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Boutilier v. Immigr. & Naturalization Serv.*,
  387 U.S. 118 (1967) ...................................................................................................29

*Burrage v. United States*,
  571 U.S. 204 (2014) ...................................................................................................30

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*,
  954 F.3d 118 (2d Cir. 2020) ......................................................................................33

*Ginzburg v. United States*,
  383 U.S. 463 (1966) ...................................................................................................29

*Loving v. Commonwealth*,
  206 Va. 924 (1966) .....................................................................................................29

*United States v. Alfaro*,
  No. 15-CR-143, 2016 WL 4708514 (W.D.N.Y. Sept. 9, 2016)...................................25

*United States v. Berrios-Berrios*,
  791 F.2s 246 (2d Cir. 1986) .......................................................................................14

*United States v. Davis*,
  No. 20-CR-79-LJV-JJM, 2020 WL 4743694 (W.D.N.Y. June 26, 2020) ...................18

*United States v. English*,
  629 F.3d 311 (2d Cir. 2011).......................................................................................15

*United States v. Enix*,
  209 F. Supp. 3d 557 (W.D.N.Y. 2016) .............................................................14, 16, 31

*United States v. Friedman*,
  837 F.2d 48 (2d Cir. 1988).....................................................................................24, 25

*United States v. Hill*,
  No. 10-CR-00191-A, 2011 WL 5403276 (W.D.N.Y. Nov. 7, 2011) ...........................25

*United States v. Long*,
  No. 13-CR-6145-FPG, 2015 WL 1458403 (W.D.N.Y. Mar. 30, 2015) ......................18

*United States v. Mattis*,
  963 F.3d 285 (2d Cir. 2020).......................................................................................17

*United States v. Maxwell*,
  510 F. Supp. 3d 165 (S.D.N.Y. 2020).........................................................................28

*United States v. Mercedes*,
  254 F.3d 433 (2d Cir. 2001)...................................................................................15, 16

*United States v. Morrissey*,
    461 F.2d 666 (2d Cir. 1972) ................................................................26

*United States v. Pierce*,
    No. 16-MR-144, 2016 WL 7421925 (W.D.N.Y. Dec. 23, 2016) ..................17

*United States v. Rodriguez*,
    950 F.2d 85 (2d Cir. 1991) .................................................................15

*United States v. Rosario*,
    792 F. App'x 76 (2d Cir. 2019) ...........................................................19

*United States v. Sabhnani*,
    493 F.3d 63 (2d Cir. 2007) ...............................................14, 16, 24

*United States v. Trenholm*,
    No. 22-MR-6024 (W.D.N.Y. March 9, 2022) .......................................17

*United States v. Watkins*,
    No. 18-CR-131-LJV, 2018 WL 4922135 (W.D.N.Y. Oct. 9, 2018) ...........21

**Statutes**

18 U.S.C. § 3142 ............................................................................14

18 U.S.C. § 3142(c)(1)(B) ................................................................15

18 U.S.C. § 3142(c)(1)(B)(i) .............................................................31

18 U.S.C. § 3142(e)(1) ....................................................................14

18 U.S.C. § 3142(e)(3) ....................................................................15

18 U.S.C. § 3142(g) .................................................................16, 21

18 U.S.C. § 3142(j) .........................................................................16

18 U.S.C. § 924(c) ..........................................................................15

18 U.S.C. § 924(c)(1)(A)(i) ..............................................................11

21 U.S.C. § 841(b)(1)(C) .................................................................29

21 U.S.C. § 856(a)(1) ......................................................................11

**Other Authorities**

Debbie Carlson, *How to Plan for Retirement and Special-Needs Care*, Barron's
    (Oct. 19, 2019) ..............................................................................7

Melissa Hamilton, *Briefing the Supreme Court: Promoting Science or Myth?*, 67
    Emory L.J. Online 2021 (2017) .........................................................28

Michael D. Morgan, *Lying in the Heartland: Problems and Solutions Regarding Polygraph Evidence in Ohio Criminal Procedure*, 26 OHIO N.U. L. REV. 89 (2000)...27

Nele de Neef et al., *Bondage-Discipline, Dominance-Submission and Sadomasochism (BDSM) from an Integrative Biopsychosocial Perspective: A Systematic Review*, 7 SEXUAL MEDICINE 129 (2019) ...........................................................9, 28, 29

Tanya Bezreh et al., *BDSM Disclosure and Stigma Management: Identifying Opportunities for Sex Education*, 7 AM. J. SEXUALITY EDUC. 37 (2012) ...............28, 29

U.S. Justice Manual § 9-13.300 ......................................................................28

## INTRODUCTION

Defendant-Appellant James P. Fox is a 38-year-old financial planner and lifelong resident of Western New York with no history of violence and no criminal record. He is willing to post a $300,000 secured bond (consisting primarily of the equity in his home in Buffalo and his parents' home in Clarence), and is willing to accept intrusive conditions of release including third-party custodianship, electronic monitoring, Internet monitoring, pole-camera surveillance, frequent reports to the Probation Office, and mandated mental-health counseling. The Probation Office recommends release on conditions.

Nothing about the Government's charges—one count of maintaining a drug premises and one count of possessing a firearm in furtherance of drug trafficking—undermines the overwhelming case for release. The parties agree that for a period of time ending in September 2020, Mr. Fox struggled with an undiagnosed sex addiction; that during this period he patronized drug-addicted escorts; that during this period he sometimes bought drugs; that during this period he legally owned a shotgun; that through spring 2021 his girlfriend used drugs in his home; and that Mr. Fox's private sexual preferences include BDSM and sex toys. Mr. Fox absolutely denies, however, that he was a drug dealer, that he operated a drug premises, and that he possessed a shotgun in furtherance of a drug-trafficking crime. He likewise denies the Government's claim, made without any accompanying criminal charge, that two women overdosed due to narcotics Mr. Fox supplied, and that Mr. Fox sexually assaulted some of the escorts he patronized. Indeed, the discovery the Government recently provided tends to undermine all of its allegations and—much to the Government's surprise, no doubt—Mr. Fox passed the polygraph examination that the Government administered "to determine whether or not he has ever had non-consensual sex with any individuals" (Declaration of Timothy W. Hoover, dated Mar. 30, 2022 ("Hoover Declaration"), Ex. E.)

More to the point of this detention proceeding, the misconduct attributed to Mr. Fox is all historical. He has not patronized any escorts since September 2020, and

has not kept drugs in the house since his girlfriend got clean around the spring of 2021. Thus, the physical and pole-camera surveillance the Government used to surreptitiously monitor Mr. Fox between December 2021 and February 2022 uncovered no drug activity, no escort activity, and no illegality of any other kind. Likewise, when federal agents executed a search warrant at Mr. Fox's residence on February 3, 2022, they found no drugs, no drug residue, and no drug paraphernalia. Mr. Fox's unused shotgun was locked in a safe.

        None of this is to deny that Mr. Fox has made poor choices; his misguided use of sex as a coping mechanism enmeshed him in a world of escorts and drug addiction that he would have otherwise avoided. But the Government's attempt to turn a sex-addicted john with a preference for BDSM into some sort of arch-criminal does not hold water. Mr. Fox is not a drug dealer or a pimp or a rapist. He is a young, well-educated, somewhat nerdy financial planner with no history of violence, no criminal record, a strong support network in Western New York, powerful incentives to contest the charges against him, and good reason to hope for success. While the legal process unfolds, he is willing to post his most valuable property, accept home detention, and submit to comprehensive monitoring of his person, residence, and Internet use. Neither the Government nor the able Magistrate Judge have even attempted to explain why such conditions would not reasonably ensure Mr. Fox's appearance and the safety of the community, and the Probation Office recommends release on just such conditions. This appeal should be granted.

## PROPOSED CONDITIONS OF RELEASE

        Because the proposed conditions of release are vital to the Court's consideration, we delineate them here. Conditions One through Five below are the bond and conditions proposed by Mr. Fox. Conditions Six through Seventeen are based on the Probation Officer's Pretrial Services Report dated February 7, 2022 (Hoover Decl., Ex. A), which recommended release. Conditions Six through Seventeen are identical to what the Probation Office proposed with one addition (italicized below) providing that the

mental-health assessment and treatment condition should include evaluation and treatment for sex addiction as appropriate. Mr. Fox would execute an acknowledgment of an Order Setting Conditions of Release that will incorporate the conditions set forth below and provide advice of penalties and sanctions, which would then be signed and approved by the Court prior to Mr. Fox's release.

1.  Defendant must post with the Court a secured bond in a form approved by the Court, of $300,000 secured by the agreement of Defendant and each surety to forfeit the property owned by Defendant (981 Beach Road, Cheektowaga, New York), and the property owned by Defendant's parents (4689 Hedgewood Drive, Clarence, New York), based upon the Court's understanding that Defendant and the sureties hold a total equity value in the properties of at least $300,000. The agreement and bond shall be posted to secure Defendant's appearance at all proceedings as required, and to secure Defendant's compliance with all the conditions set forth herein. The failure to appear as required or otherwise comply with the conditions set forth herein shall result in forfeiture of the properties utilized to secure the $300,000 bond.

2.  Defendant shall be placed in the custody of his father, Donald Fox, who must execute an agreement promising to (a) supervise Defendant in accordance with all conditions of release; (b) use every effort to assure the appearance of Defendant at all scheduled court proceedings; and (C) notify the Court immediately in the event Defendant violates any conditions of release or is no longer in his custody.

3.  Defendant must participant in the "Home Detention" location-restriction program and abide by all the requirements of the program which will include electronic monitoring or other location-verification system, as recommended by the Probation Office and approved by the Probation Office and the Court. Defendant shall pay all or part of the costs of the program based upon his ability to pay as determined by the Probation Office. "Home Detention" means that Defendant is restricted to his residence at all times except for employment; education; religious services; medical, substance-abuse, or mental-health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the Probation Office.

4.  The Probation Office will install monitoring software on any phones, computers, or connected devices that the Defendant uses. The Defendant will notify the Probation Office of all phones, computers, and connected devices that he uses to access the Internet. Defendant shall not access the Internet from any other devices.

5.      Defendant shall not utilize the Internet or any other means to search for, review, or access sites related to escorts, and the Defendant shall not contact, attempt to contact, associate with, or be in the presence of any person holding herself out as an escort.

6.      Defendant shall report to Pretrial Services within 24 hours of release and as directed by the U.S. Probation Officer.

7.      Defendant shall surrender any passport/passport card to the Clerk of the Court and surrender other international travel documents to the appropriate authorities.

8.      Defendant shall not obtain a new passport or other international travel documents.

9.      Defendant's travel is restricted to the Western District of New York, unless Court permission is granted to travel elsewhere.

10.    Defendant shall remain at a verifiable address as approved by the Probation Office.

11.    Defendant shall possess no firearm or destructive device.

12.    Defendant shall submit to a mental-health evaluation and/or treatment as approved by the Probation Office, including co-pay, *including an assessment for sex addiction and treatment as determined appropriate.*

13.    Defendant shall refrain from any use of alcohol.

14.    Defendant shall refrain from the use or unlawful possession of a narcotic drug unless prescribed.

15.    Defendant shall submit to drug/alcohol testing and/or treatment as directed by the Probation Office, including co-pay.

16.    Defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited-substance testing which is required as a condition of release.

17.    Defendant shall report within 72 hours to the Probation Office any contact with any law-enforcement personnel, including, but not limited to any arrest, questioning, or traffic stop.

## **CITATION KEY**

The notation "Dkt. ___" refers to items filed in Case No. 22-M-5007.

Following the execution of a search warrant on the morning of February 3, 2022, Mr. Fox was interviewed by law enforcement at the Lancaster Police Department. Those interviews were videotaped. There are three video files: an initial interview ("Interview 1"); a video of Mr. Fox sitting in a room; and a follow-up interview and polygraph examination ("Interview 2"). Interview 1 and Interview 2 are provided as part of Exhibit D to the separately filed Hoover Declaration. Pinpoint citations to Interview 1 and Interview 2 refer to the video's timestamp, not to the time of day. The three video files are being provided to the Court on a thumb drive, via hand delivery.

Detention proceedings before Hon. Michael J. Roemer took place on February 8, 2022 and February 11, 2022. Transcripts of those proceedings have been prepared.[1] The notation "Hrg. 1 Tr." refers to the transcript of the February 8 appearance (Dkt. 11). The notation "Hrg. 2 Tr." refers to the transcript of the February 11 appearance (Dkt. 10). Pinpoint citations to these transcripts refer to the printed page numbers in the upper right-hand corner of the transcripts, not to the CM-ECF page stamps. Hrg. 1 Tr. is also provided at Exhibit B to the Hoover Declaration. Hrg. 2 Tr. is Exhibit F to the Hoover Declaration.

The Pretrial Services Report recommending release is also being provided to the Court in hard copy, for filing under seal. Various exhibits are described in the Hoover Declaration, and are either publicly filed or are provided to the Court for filing under seal.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

### A.   Mr. Fox's personal history and background.

As set forth in the Pretrial Services Report, Mr. Fox was born in Buffalo and has spent his entire life in Western New York. (Hoover Decl., Ex. A.) He is the 38-year-old son of Donald and Amy Fox of Clarence. Don is 75 and Amy is 73. Mr. Fox was raised by his parents at their home at 4689 Hedgewood Drive in Clarence. Mr. Fox's

---

[1]      Audio recordings of these proceedings are also available to the Court.

parents still live on Hedgewood, although they spend time during the winter in Florida. Mr. Fox has one sister, Colleen, age 40, who also lives in the Buffalo area.

Mr. Fox grew up in a loving and supportive home with his parents and sister, although he did suffer sexual abuse at the hands of an adult male relative when he was a child. Mr. Fox has no criminal record and he rarely travels, his only notable foreign travel occurring during college and on family vacations when he was in his 20s.

Mr. Fox is a product of the Clarence public schools. He played the drums growing up and played town league baseball. He graduated from Clarence High School in 2001. He attended Buffalo State College, and received his bachelor's degree in Sociology in 2005. He continued his studies at Buffalo State and received a master's degree in Criminal Justice in 2009.

On a personal level, Mr. Fox is an affable, earnest, somewhat introverted, slightly nerdy person who lives in a modest home in Cheektowaga with his girlfriend, Rachel Dellavalle, who he has dated since September 2020.

Mr. Fox has lived at the Cheektowaga home—981 Beach Road—for the past ten years. Beach Road, in the Maryvale School District, is a residential area just southeast of where the Thruway bends to the east in Cheektowaga/Williamsville. Mr. Fox's parents owned the Beach Road house for over twenty years before deeding it to their son. The property is a duplex. Mr. Fox lives on the right side (viewing the house from the street). Mr. Fox eats there, he sleeps there, his girlfriend lives there, and he sometimes works from his home office.

While an undergraduate at Buffalo State, Mr. Fox obtained a job at GEICO training new agents and developing the Buffalo branch's homeowner's insurance department. He worked at GEICO from 2005 to 2010. He then decided to pursue a career as a financial planner. For 2010 until his arrest, he was employed as a certified financial planner at Equitable Advisors in Williamsville. As part of his work at Equitable, he also was affiliated with The BlackOak Group. (Hoover Decl., Ex. I.) Mr. Fox developed a significant group of clients and families who trusted him to grow their

savings and investments. He earned the Certified Financial Planner designation from the College of Financial Planning, and carries various FINRA registrations and licenses. (Hoover Decl., Ex. H, Ex. I.)

Mr. Fox has developed a specialty helping clients plan for the futures of family members with special needs, to ensure appropriate medical and assistive care long after the parents' pass away. He earned the designation of Chartered Special Needs Consultant in Special Needs Planning from the American College of Financial Services in 2017. We understand that this designation has been awarded to approximately 350 financial planners in the United States. Media reports refer to Mr. Fox as a subject-matter expert. (*See, e.g*, Hoover Decl., Ex. J (Debbie Carlson, *How to Plan for Retirement and Special-Needs Care*, BARRON'S (Oct. 19, 2019)).)

As his career progressed, Mr. Fox became active in the community, eschewing high-profile boards in order to volunteer and raise money for charitable causes. Year in and year out, Mr. Fox was part of the team that helped plan Equitable's annual day of service (Hoover Decl., Ex. I), he volunteered to teach community education workshops for families, and he has volunteered for and through Rock Autism (Hoover Decl., Ex. L), Fantastic Friends (Hoover Decl., Ex. K), and ARC. This community devotion it part of who Don and Amy raised their son to be.

While Mr. Fox's physical health is generally good, he has dealt with depression and anxiety, and has sought counseling through Evergreen Health. Mr. Fox also enrolled in what we understand was a two-week outpatient program at Erie County Medical Center around May 2021 to help him address his mental-health needs. He has been prescribed various medications to help with his anxiety, including medical marijuana, Wellbutrin, and Clonidine. He previously has abused alcohol, marijuana, and a prescription for Adderall.

In addition to drugs, Mr. Fox has turned to sex as a coping mechanism. Going back at least five years or more, Mr. Fox has struggled with what he describes as a sex addiction. Like any addiction, Mr. Fox's need for sex became a compulsion that

dominated his thinking and sucked him into a world he would not have otherwise inhabited. At the height of his sex addiction, Mr. Fox was spending tens of thousands of dollars on adult female escorts in the Buffalo area, who he located through Internet advertisements and contacted by phone call or text message. The escorts were addicted to drugs and used the money they earned from "dates" to buy drugs.

Mr. Fox's relationships with escorts were predictably messy. In some instances, he would pay for an isolated sexual encounter. When he met an escort with whom he felt some rapport, the line between "escort" and "girlfriend" often became blurred: these women would come to live with Mr. Fox; he would pay for the things they wanted, help them with unrelated criminal charges, help them get clean if they wanted to do so, host their children's birthday parties, and so on; and the sexual relationship would continue.

As to drugs and sex, Mr. Fox was only ever a customer. He was neither a drug dealer nor a pimp. Nor was he ever coercive. Mr. Fox did not push drugs on anyone, was never violent with anyone, never coerced anyone to have sex, and never raped anyone.

Over time, Mr. Fox's unresolved mental-health issues and his self-destructive coping mechanisms began to take a toll. His work performance suffered. He knew he needed to make a change.

The roots of that change came when he was introduced to Rachel Dellavalle in September 2020. Mr. Fox and Ms. Dellavalle began dating, and their relationship continues to this day, with plans to marry. Though Ms. Dellavalle previously worked as an escort, they were introduced by a mutual friend and Ms. Dellavalle has not worked as an escort since she began seeing Mr. Fox.

Mr. Fox's relationship with Ms. Dellavalle has been positive for both of them. It was the end of Mr. Fox's sex with escorts. And it was the beginning of Ms. Dellavalle's path to recovery from serious drug addiction. Following a mental-health episode and the commencement of treatment in the spring of 2021, Ms. Dellavalle has

been drug-free. Ms. Dellavalle has continued to live with Mr. Fox at the Beach Road residence, and Mr. Fox continued to receive counseling for depression and anxiety.

Mr. Fox and Ms. Dellavalle both have a preference for safe, consensual BDSM sex. As Mr. Fox put it in his interview with federal agents, "I'm into some kinky stuff, but all of it has to have consent." (Interview 2 at 40:49-41:01; *accord id.* at 57:36-57:45 (Mr. Fox stating his preference for "[r]ole play of like BDSM stuff. I'm dominant. They're submissive. But consensual."); *id.* at 1:00:50-1:00:56 (Mr. Fox stating that every sexual act he has ever done with anyone is "100% consensual").) BDSM "refers to a physical, psychological, and sexual role-play involving power exchange between consensual participants." Nele de Neef et al., *Bondage-Discipline, Dominance-Submission and Sadomasochism (BDSM) from an Integrative Biopsychosocial Perspective: A Systematic Review*, 7 SEXUAL MEDICINE 129, 129 (2019). In the "stereotypical setting, there is a dominant partner (D) in charge of the scene, and a submissive partner (s), who consents to being submitted to the actions of the dominant." *Id.* at 134. The shift in power dynamics may be expressed in various ways, including "rituals" such as kneeling or using certain titles, "movement restriction," and "sensory deprivation." *Id.*

During the detention hearing, the Government presented Judge Roemer with photos of BDSM activity, claiming that they depicted non-consensual or coercive sex with escorts. (Hrg. 2 Tr. at 12 ("He is into some very disturbing, disturbing sexual activity."); *accord id.* at 14.) As Ms. Dellavalle confirmed, she is the woman in all of the photos, and the scenes depicted were not only consensual but were her idea. (*Id.* at 27-28; Hoover Decl., Ex. G ("All of these ideas were <u>mine</u> not his, I came up with them and wanted them + wasn't forced!  Rachel Dellavalle 2/10/2022[.]").)

**B.     The Government's investigation.**

In November 2021, the Government began investigating Mr. Fox based on an interview that took place as part of a separate investigation. Rather than immediately arresting Mr. Fox, however, the Government sought out corroboration.

Though the Government did not mention it during the detention proceedings, discovery provided after the detention proceedings shows that the Government installed a pole camera outside Mr. Fox's residence on December 13, 2021. As far as we know, the pole-camera surveillance continued through the detention hearing. Nothing of note was detected.

A search-warrant application indicates that the Government also conducted "frequent spot surveillance at [Mr. Fox's house], with the last time being on February 2, 2022." Here too, the Government's surveillance yielded no evidence of illegal activity. The Government did not mention its fruitless spot surveillance during the detention proceedings, and did not provide defense counsel with the search-warrant application under after the proceedings concluded.

On February 2, 2022, the Government obtained a search warrant from Magistrate Judge Michael J. Roemer. A large number of armed agents, supported by some type of armored-type vehicle, executed the warrant on February 3, early in the morning. Mr. Fox and Ms. Dellavalle were at home. No one else was present. No drugs were located. A shotgun that Mr. Fox had legally purchased years earlier and never fired was found locked in a safe. Mr. Fox provided access to the safe. Agents seized various sex toys, restraints, and sex furniture, but did not recover any evidence of non-consensual sex.

Mr. Fox was either detained or arrested, and then taken to the Lancaster Police Station. Initially, the agents lied about the nature of their investigation. Mr. Fox was cooperative. Eventually, the agents admitted that they were investigating claims of non-consensual sex with escorts. Mr. Fox remained cooperative, and when the Government asked him to take a polygraph examination he agreed. Mr. Fox described his sex addiction (Interview 1 at 18:25), he described his interactions with escorts and his sexual preferences (*id.* at 29:15), and he expressed insight into the problems that his sex addiction had caused him (*id.* at 23:39). Interview 2 was dedicated to a further discussion of the Government's allegations, preparation for the polygraph examination,

and the polygraph itself. Over the course of these post-arrest interviews, on at least 12 separate occasions, Mr. Fox categorically denied ever having non-consensual sex with anyone.[2]

Once the polygraph examination was completed, Government agents drove Mr. Fox back to his house at 981 Beach Road. The agents did not charge him with an offense or take him to the federal courthouse; they just dropped him off at home. Before they did so, they repeatedly praised him for his complete cooperation with them. (*See, e.g.*, Interview 1 at 10:10-10:25.)

Despite the startling events of the day, Mr. Fox went to work and then returned home in the late afternoon or early evening.

**C.    The Criminal Complaint and Mr. Fox's arrest.**

Later on February 3, the Government decided to charge Mr. Fox by Criminal Complaint (Dkt. 1). The Criminal Complaint contains two counts. The first charges Mr. Fox with violating 21 U.S.C. § 856(a)(1) (unlawfully maintaining a place for the purposes of using heroin). The second count charges Mr. Fox with violating 18 U.S.C. § 924(c)(1)(A)(i) (unlawfully possessing a firearm in connection with a drug-trafficking crime).

When agents set out to arrest Mr. Fox on the evening of February 3, they found him at his home in Cheektowaga. Mr. Fox made an initial appearance before Judge Roemer on February 4, and the Government moved for detention.

**D.    The Probation Office's release recommendation and the Magistrate Judge's detention order.**

The Probation Office interviewed Mr. Fox, verified the information he provided with his father, Donald Fox, and submitted to Judge Roemer a Pretrial Services Report recommending that Mr. Fox be released on conditions. (Hoover Decl.,

---

[2]    The interview videos have been provided to the Court. (*See* Hoover Decl. Ex. D.) We welcome the Court's review of both Interview 1 and Interview 2 in their entirety, so the Court can assess Mr. Fox's credible and repeated denials of illegal sexual activity.

Ex. A.) The Pretrial Services Report did not propose that any secured bond be executed, did not suggest that Home Detention with electronic monitoring/GPS be imposed, and did not propose any Internet/phone monitoring for any devices that Mr. Fox uses.

Mr. Fox retained the undersigned counsel on the afternoon of February 7. Counsel spoke with one of the prosecutors that afternoon and was informed that discovery relevant to the Government's detention arguments would be provided. The prosecutors provided recordings of Interview 1 and Interview 2 on February 8, the morning of the detention hearing. Defense counsel had not yet reviewed Interview 2 by the time the detention hearing began. The Government proceeded exclusively by proffer. The Government's proffer focused almost exclusively on the alleged but uncharged sexual assaults, with the prosecutors claiming that Mr. Fox committed such acts and confessed during Interviews 1 and/or 2. (Hrg. 1 Tr. at 9.) The prosecutor also claimed that Mr. Fox "admits to, sourcing heroin causing girls to overdose." (*Id*. at 11.)

The Probation Officer continued to recommend release.  (*Id*. at 19.)

Defense counsel opposed detention. After canvassing the release factors, discussing Mr. Fox's personal background and ties to the community, and proposing release conditions, defense counsel objected to the Government's use of a proffer to make generic, anonymized allegations of sexual assault. (*Id*. at 19-20.) Based on its discussions with Mr. Fox and its review of Interview 1, the defense indicated that Mr. Fox did not confess to any sexual assaults. (*Id*. at 20, 33.) Counsel also noted the absence of any polygraph results. (*Id*. at 19.)

Judge Roemer noted the parties' disagreement about whether Mr. Fox had made the admissions the Government attributed to him (*id*. at 38-39, 42), and the fact that there was no polygraph result yet (*id*. at 39-40), and continued the hearing until February 11, 2022 (*id*. at 44).

Before that date, the polygraph was scored by an out-of-state examiner unconnected to the investigation. The report states that the Government administered the polygraph "to determine whether or not [Mr. Fox] has ever had non-consensual sex

with any individuals." (Hoover Decl., Ex. E at 1.) The out-of-state examiner concluded that when Mr. Fox denied ever having non-consensual sex with anyone, "the physiological responses to the relevant questions were not indicative of deception." (*Id.* at 3.)

At the resumed hearing, the Government played parts of Interviews 1 and 2.[3] It also presented photos of Ms. Dellavalle engaging in BDSM sex and told Judge Roemer that the photos depicted or substantiated the allegations of non-consensual sex with escorts. (Hrg. 2 Tr. at 11 *et seq.*) The Government also cited the access date shown in the photos' metadata—rather than the much-earlier creation date—in an effort to establish that Mr. Fox had seen escorts recently. (*Id.* at 15.)

Defense counsel informed Judge Roemer that the photos depicted Ms. Dellavalle engaging in entirely consensual conduct, and presented Ms. Dellavalle's statement to that effect. (*Id.* at 27; Hoover Decl., Ex. G.) Defense counsel also pointed out that Mr. Fox had not made the confessions the Government attributed to him (Hrg. 2 Tr. at 24-25, 47-49), and that the polygraph results indicated that Mr. Fox was telling the truth (*id.* at 25, 34-35).

Judge Roemer found that Mr. Fox had rebutted the applicable presumption (*id.* at 51), and that he had a sex addiction (Dkt. 7 at 3), but nevertheless ordered him detained (*id.* at 1). Judge Roemer did not explicitly consider or assess the bond and release conditions that Mr. Fox and the Probation Office had proposed. A written detention decision was subsequently entered. (*Id.*) Much of Judge Roemer's analysis focused not on the nature, circumstances, and strength of the charged offenses,

---

[3]        On the afternoon before the hearing, defense counsel provided the videos of the February 3, 2022 interviews (including Interview 1 and 2) to Judge Roemer via hand delivery of a thumb drive to the Courthouse. (Hoover Decl., Ex. C.) However, the package did not make it upstairs to Chambers before the detention hearing resumed late on the morning of February 11. Judge Roemer decided not to view all of Interview 1 and Interview 2 before deciding the Government's motion.

but on the nature, circumstances, and strength of the uncharged offenses. (*Id*. at 3; Hrg.
2 Tr. at 51-52.)

      **E.**    **Post-hearing discovery.**

      After the detention proceedings, the Government provided discovery
consisting of heavily redacted case reports and extractions from Mr. Fox's phone. The
discovery confirmed that all of the alleged misconduct is historic; there is no evidence of
recent drug or escort activity. In addition, no corroborating evidence of illegal sexual
conduct has been provided. No physical or scientific evidence of illegal sexual conduct
has been provided. No contemporaneous reports or allegations of illegal sexual conduct
have been provided. And there is no evidence of any illegal activity on Mr. Fox's phone.

## LEGAL STANDARD AND APPLICABLE LAW

      In federal cases, "it is only a limited group of offenders who should be
denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007)
(cleaned up). The Bail Reform Act codified the "traditional presumption favoring
pretrial release for the vast majority of Federal defendants." *United States v. Berrios-
Berrios*, 791 F.2s 246, 249 (2d Cir. 1986) (cleaned up). Under 18 U.S.C. § 3142, release
pending trial is required "unless the release will present a risk of flight or danger, or
both, and no set of conditions can reasonably protect against those risks." *United States
v. Enix*, 209 F. Supp. 3d 557, 562 (W.D.N.Y. 2016) (releasing defendant implicated in
violent racketeering acts and threats pending trial to live in Florida, with the posting of
multiple properties, a third-party custodian, and Home Detention, among myriad other
conditions; defendant complied with all of the conditions of his release for the next 21
months until trial was completed).

      The standard for the release/detention determination is whether there is a
condition or combination of conditions that "will reasonably assure the appearance of
the person as required and the safety of any other person and the community . . . ." 18
U.S.C. § 3142(e)(1). If there are, the defendant must be released on a "condition, or
combination of conditions, that such judicial officer determines will reasonably assure

the appearance of the person as required and the safety of any other person and the community . . . ." *Id.* § 3142(c)(1)(B).

Where the defendant is charged with certain Controlled Substances Act offenses or an offense under 18 U.S.C. § 924(c), and the judicial officer finds probable cause to believe that the offenses were committed, there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community . . . ." *Id.* § 3142(e)(3).  In those instances, the defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). A defendant rebuts the presumption by introducing "some evidence contrary to the presumed fact[s] in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). Where, as here, the presumption is rebutted, it remains a factor that is weighed by the district court, *Mercedes*, 254 F.3d at 436, but "at all times . . . the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community[,] and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight," *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (cleaned up).

The relevant factors are:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including--

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug

or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .

18 U.S.C. § 3142(g).

When seeking to detain a defendant as a flight risk, "the government carries a dual burden." *Sabhnani*, 493 F.3d at 75 (cleaned up). First, it must "establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight." *Id.* Second, it must "demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." *Id.*

In order to detain the defendant on the grounds of dangerousness, the Government must establish "dangerousness by clear and convincing evidence." *Mercedes*, 254 F.3d at 436.

A district judge's review of a magistrate judge's detention order is *de novo*. The reviewing district judge "should not simply defer to the judgment of the magistrate judge, but rather must reach her own independent conclusions." *Enix*, 209 F. Supp. 3d at 564. Additional evidence can be considered. *Id.*

Nothing in the Bail Reform Act limits the presumption of innocence. *See* 18 U.S.C. § 3142(j).

## ARGUMENT

I. **MR. FOX PRESENTS NEITHER A RISK OF FLIGHT NOR A RISK OF DANGER.**

   A. **The nature and circumstances of the charged offenses supports release.**

The nature and circumstances of the charged offenses, even when taken at face value, strongly favors release. In drug and gun cases, district judges typically evaluate the severity of the charges by asking what quantities of narcotics were allegedly possessed or distributed, what quantities of narcotics were recovered, were numerous firearms recovered, what type of firearms were recovered, were those firearms legal or illegal, were those firearms fired or brandished, and has the defendant threatened to use those firearms. Thus, in *United States v. Pierce*, No. 16-MR-144, 2016 WL 7421925 (W.D.N.Y. Dec. 23, 2016), the Court wrote:

> In this case, significant quantities of controlled substances and drug paraphernalia (cutting agents, packing materials, etc.) were recovered from the alleged drug premises (a house with upper and lower apartments). The controlled substances themselves are dangerous—in particular, heroin is a scourge in this community that is claiming many lives. But beyond that, the firearms that the defendants allegedly possessed in connection with their drug operation are especially worrisome. In the alleged drug premises, the government recovered six firearms. The handles of some firearms were covered in electrical tape, suggesting that they were ready to be used in criminal activity, with the tape—and fingerprints on it—able to be removed easily. Two of the firearms were semi-automatic rifles. Multiple firearms, including one of the rifles (apparently a United-States-marketable AK-47 clone), also appear to have been loaded with high-capacity magazines in violation of New York law. Possessing such firearms during and in relation to the alleged drug trafficking crimes is very serious and weighs heavily in favor of detention.

*Id.* at *3.

Even when the defendant is charged with violent and dangerous conduct, release may be appropriate. *See, e.g.*, *United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020) (affirming release on $250,000 bond and home detention where the defendants were charged with throwing a Molotov cocktail into a police vehicle); *United States v. Trenholm*, No. 22-MR-6024 (W.D.N.Y. March 9, 2022), ECF No. 6 (affirming release

order where the defendant was charged with detonating an M-150 explosive device in an apartment building).

   Here, there is nothing of the sort. Mr. Fox is charged with maintaining his residence for the purpose of using or distributing narcotics in connection with patronizing escorts. There is no allegation of narcotics trafficking in the traditional sense, and no drugs, drug residue, or drug paraphernalia were found in the residence. The weapons count likewise falls at the mildest end of the spectrum. The shotgun in question was found loaded but locked in a safe, and there is no allegation that the shotgun is illegal, or that Mr. Fox ever fired it, or that Mr. Fox ever brandished it, or that Mr. Fox ever threatened to shoot anyone with it. In addition, the escort-related activity central to the drug-premises and weapons counts has not occurred since approximately September 2020.

  **B.**  **The weight of the evidence regarding the charged offenses supports release.**

   "Some courts have described the weight of the evidence factor as the least important of the § 3142(g) factors because it is inherently difficult to assess the Government's case before trial and a defendant must be presumed innocent." *United States v. Davis*, No. 20-CR-79-LJV-JJM, 2020 WL 4743694, at *1 (W.D.N.Y. June 26, 2020) (cleaned up), *findings sustained*, No. 20-CR-79 (W.D.N.Y. July 7, 2020), ECF No. 50 (releasing defendant on conditions where defendant was driver of SUV that struck police officers and from which a firearm was discharged).

   To the extent the Court puts stock in this factor, it favors release. Count 1 of the Criminal Complaint is weak. To convict Mr. Fox for operating a drug premises, the Government would have to prove that his *purpose* in owning 981 Beach Road was to use or distribute drugs. (Dkt. 1 at 1.) If a house is primarily a residence, and using or distributing drugs is merely incidental to that purpose, the house is not a drug premises. *See United States v. Long*, No. 13-CR-6145-FPG, 2015 WL 1458403, at *11 (W.D.N.Y. Mar. 30, 2015), *aff'd*, 678 F. App'x 31 (2d Cir. 2017). Here, Mr. Fox used 981 Beach

Road as his residence, not a drug house. The agents who searched the home found no drugs, no drug residue, no scales, no baggies, no vials, no cash, and no other evidence of drug use or distribution. If escorts visiting 981 Beach Road used drugs, that does not alter its essential character as a residence.

Count 2 of the Criminal Complaint is weak as well. To prevail, the Government would have to prove not merely that Mr. Fox possessed a shotgun but that he did so in furtherance of a drug-trafficking crime. *See, e.g.*, *United States v. Rosario*, 792 F. App'x 76, 78 (2d Cir. 2019) ("Because a gun may, of course, be possessed for any of a number of purposes, some lawful, others unlawful, Section 924(c)(1)(A)'s 'in furtherance of' element cannot be satisfied by relying on the generalization that any time a drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns to protect themselves and their drugs." (cleaned up).) Thus, in *Rosario*, the Second Circuit found an insufficient factual basis for a § 924(c)(1)(A) conviction where a drug dealer admitted that he possessed a handgun for protection near the scene of drug-trafficking activity. *See id.* at 78-79.

Here, although the Government has evidence that Mr. Fox (legally) possessed a shotgun, it lacks evidence that he possessed the weapon in furtherance of drug trafficking.

First of all, there is a substantial dispute about the drug-trafficking predicate. During his post-arrest interviews, Mr. Fox stated that he sometimes bought drugs for his girlfriend and that he rarely bought drugs for escorts. He never said that he was a drug dealer. (Interview 1 at 17:10 (Mr. Fox stating he bought heroin for his girlfriend when she was suffering withdrawal symptoms); *id.* at 27:05 ("I give them [escorts] money and then they would get drugs from someone."); *id.* at 28:30-29:11 (Mr. Fox alluding to "buying them [escorts] some small amount of drugs"); *id.* at 47:18-47:30 (Mr. Fox acknowledging that he stored drugs for his girlfriend inside his safe); Interview 2 at 33:27-33:38 (Mr. Fox: "I had a sex addiction. I involved myself with escorts. They use drugs. I was around drugs."); *id.* at 55:00-55:19 (Mr. Fox stating that

he gave escorts drugs "indirectly" by giving them money which they used for drugs); *id.* at 55:56-55:55 (Mr. Fox stating that he occasionally bought drugs for escorts); *id.* at 55:55-56:07 (Mr. Fox stating that he usually paid escorts in cash); *id.* at 1:02:20-1:03:09 (Mr. Fox stating that escorts typically use drugs before a sexual encounter, not with the customer); *id.* at 1:05:34-1:06:40 (Mr. Fox stating that he gave escorts drugs if they were experiencing withdrawal symptoms).[4])

Relatedly, there is a substantial dispute about whether Mr. Fox possessed a shotgun to facilitate his supposed drug dealing, or simply in connection with buying drugs. Before Judge Roemer, the Government tried to neutralize this issue by mischaracterizing Mr. Fox's post-arrest statements. Claiming that its "lengthy law enforcement investigation"[5] had been corroborated by Mr. Fox's "confession" (Hrg. 1 Tr. at 9), the Government showed Judge Roemer a PowerPoint slide that read: "Law enforcement recovered a loaded shotgun which the defendant *admitted* that he *used* in order to protect himself while dealing with *other* drug dealers and pimps." (Hoover Decl. ¶ 5 (emphasis added).) Counsel for the Government repeated the point during his oral presentation. (Hrg. 1 Tr. at 10 ("Law enforcement recovered a loaded shotgun which the defendant *admitted* that he *used* to protect himself when dealing with *other* drug dealers and pimps." (emphasis added)).)

These statements are inaccurate. Mr. Fox never said he used the shotgun. In fact, he said the opposite. (Interview 2 at 58:45-59:41.) Nor did Mr. Fox say that he possessed the shotgun to protect himself from "*other* drug dealers"—which would imply that he too was a drug dealer. Instead, when asked why he had the shotgun, Mr. Fox said: "I mean, look at me. And then I'm not the type of person that is used to interacting

---

[4]     Judge Roemer misapprehended the record when he said "[t]here doesn't seem to be any dispute that he was using drugs to pay these prostitutes" (Hrg. 2 Tr. at 52).

[5]     Post-hearing discovery has revealed that the Government's investigation of Mr. Fox began in November 2021, so "brief" is probably more apt than "lengthy."

with *like drug dealers* and shit like that. And rather worried about my safety."
(Interview 1 at 47:29-47:47 (emphasis added).) This statement implies that Mr. Fox is
*not* himself a drug dealer. Even the Government ultimately conceded that there are "two
different ways to view" Mr. Fox's statements. (Hrg. 2 Tr. at 43.)

      In sum, as to the charged offenses,[6] the most that can be said with any
confidence is that Mr. Fox had personal-use amounts of drugs in his house years ago,
and he legally possessed a shotgun that he never brandished or fired. *Compare with
United States v. Watkins*, No. 18-CR-131-LJV, 2018 WL 4922135, at *5 (W.D.N.Y. Oct.
9, 2018), *aff'd*, 940 F.3d 152 (2d Cir. 2019) (affirming detention order entered after the
district court watched surveillance video of the convicted-felon defendant running down
a street, chasing a car, and "apparently firing a weapon . . . ."; defendant had numerous
prior felony convictions and a history that was "not good"). This stale, spotty evidence
does nothing to suggest a current risk of danger or flight.

    **C.**    **Mr. Fox's history and characteristics weigh in favor of release.**

      Mr. Fox's history and characteristics overwhelmingly demonstrate that he
is a strong candidate for release.

      *Character*. Mr. Fox has a demonstrated history of being a good son,
employee, and contributing member of his community. He has volunteered to support
worthy causes and even his professional endeavors focus on helping families with
special-needs children.

      *Physical and mental condition*. Mr. Fox is in good physical health. His
mental health is more doubtful—he is dealing with anxiety, depression, and addiction—
but he has actively sought out counseling, and attended an ECMC outpatient program in
late spring 2021. These factors support release.

---

      [6]     The analysis under 18 U.S.C. § 3142(g) requires the Court to consider the
nature, circumstances, and strength of the charged offenses, not uncharged offenses. We
address the uncharged offenses below. *See infra* §§ II-III.

*Family ties*. Mr. Fox's family ties are strong and support release. As the Hoover Declaration explains, his parents are close to him, they will post their home, and his father will assume a custodial role to provide extra stability and assurance that Mr. Fox will abide by all of his release conditions. Mr. Fox's parents live less than 15 minutes from him. (Hoover Decl., Ex. S.) These factors reduce the risk that Mr. Fox will become a fugitive or shirk his release conditions.

*Employment*. Mr. Fox's employment history is long-term, stable, and a significant factor supporting his release. (*Id.*, Ex. H, Ex. I, Ex. J.) He has been productive, a good team member, and has continually helped co-workers and clients achieve their goals. He was never accused of wrongdoing in the workplace. While he lost his employment as a result of his arrest and detention, he will pursue and can find gainful employment while the case is pending.

*Financial resources*. With the loss of his job, Mr. Fox's financial picture is much less bright than it was, and the reality is he lives a modest lifestyle, has a modest amount of equity in his home, and has a modest retirement account. He drives a nine-year old vehicle, and lives in a middle-class neighborhood. He and his parents are not wealthy individuals. Still, he and his parents are willing to post all of the equity in their homes to support his release and assure his appearance.

*Length of residence in the community*. Mr. Fox has lived in Buffalo his entire life. He was born here, grew up here, was educated here, works here, and lives here. He is accurately described as a homebody. He goes to work, not far from where he lives, and then returns home.

*Community ties*. For the same reason, Mr. Fox's community ties are significant. His parents live here (except when wintering in Florida). His sister lives here. His girlfriend lives here. His work friends live here. And he has been active in the community to an impressive extent.

*Past conduct*. Mr. Fox has no criminal record. He is a hard-working, law-abiding, dependable provider for himself and his girlfriend, and a valuable contributor

to his community. He has been gainfully employed and meets his obligations. This history confirms that he will not flee or endanger his community if released.

*History relating to drug and alcohol abuse.* Mr. Fox has abused marijuana, Adderall, and alcohol in the past, though his use of prescription drugs was sanctioned by his prescriber. And while he has no criminal record, he was convicted of driving while ability impaired in Cheektowaga Town Court in 2017. Admirably, Mr. Fox has worked hard to address those problems. At the time of his arrest he was not abusing any substance. An assessment and outpatient treatment will more than adequately address these issues. There is no indication that Mr. Fox could better address his substance-abuse issues if he were detained.

*Criminal history*. Mr. Fox has no criminal history and no criminal convictions. A lengthy criminal history is often cited as a reason to detain. The absence of any criminal history here strongly favors release.

*Record concerning appearances at court proceedings*. Mr. Fox appeared as required for his noncriminal DWAI matter in Cheektowaga. This factor also supports release.

*Parole/probation/release status*. Mr. Fox has never been on parole or probation.

**D.    There is no danger to anyone if Mr. Fox is released.**

As delineated more fully below, *see infra* § III, the Government has failed to prove that Mr. Fox presents a danger to any specific person or to the community. The only potential safety issue arises from Mr. Fox's interactions with escorts. Those interactions ended in September 2020, the Government's pre-arrest surveillance confirms that Mr. Fox has not resumed seeing escorts recently, and the proposed conditions of release will ensure that he does not see escorts in the future.

**II.    THE GOVERNMENT DID NOT AND CANNOT PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE MR. FOX'S APPEARANCE.**

Before Judge Roemer, the Government offered two grounds for finding a risk of flight, neither of which is persuasive, and it entirely ignored the conditions of release proposed by the Probation Office and Mr. Fox.

*First*, the Government claimed that Mr. Fox has the means to flee because he has "access to large amounts of money." (Hrg. 1 Tr. at 12; *accord id.* (claiming that Mr. Fox has "a job that pays quite a bit of money").) And Judge Roemer cited this fact in his findings. (Hrg. 2 Tr. at 51 ("He also ha[s] the means to flee, if he does that, based on his financial status.").) But the undisputed evidence shows that the "large amount[] of money" the Government posited is $20,000 cash. (Hrg. 1 Tr. at 21-22, 35.) That kind of money buys a plane ticket, but it does not support a life in exile. *Compare Sabhnani*, 493 F.3d at 76 ("The defendants have assets in the millions of dollars, which they could easily access to finance flight, not only for themselves but for their entire family.").

*Second*, the Government claimed that Mr. Fox has a motive to flee because he is facing serious charges. But almost every defendant charged in federal court is facing "serious" charges. The Second Circuit requires more than serious allegations and the prospect of a lengthy sentence to detain a defendant as a flight risk. *See United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (per curiam). Moreover, Mr. Fox's realistic exposure on the present charges is in the neighborhood of five years' imprisonment. That is a very substantial sentence, to be sure, but it is not so substantial that it can be expected to create a nothing-to-lose attitude in a 38-year-old professional. Moreover, the Government's argument does not account for Mr. Fox's ties to Western New York. *Compare Friedman,* 837 F.2d at 49-50 (finding no substantial risk of flight largely due to the defendant's community ties), *with*, *Sabhnani*, 493 F.3d at 76-77 (finding flight to be a particular concern where wealthy defendants, who were naturalized citizens, "maintained strong family ties to their native countries as well as

personal and professional ties to various locations in Europe and the Middle East"). Nor does the Government's argument account for Mr. Fox's maturity and rationality, which counsel against an act as counterproductive as flight.

The Government will say that the uncharged conduct is considerably more serious than the conduct it has presently charged. (Hrg. 2 Tr. at 24 ("[N]ow that the defendant has seen this case laid out before him, and understands what the government's focus is, we do believe he does pose a flight risk.").) The best rebuttal to this argument is what happened on the day of Mr. Fox's arrest. Early in the morning, armed federal agents kicked down his door, brought him in handcuffs to a police station, and (falsely) accused him of rape. (Hrg. 1 Tr. at 25-27.) Thus, when Mr. Fox was returned home following the polygraph examination, he was well aware of the seriousness of the situation and the most heinous misconduct attributed to him. Yet when the Government went to arrest him several hours later, he was not at the airport or the train station, but at home. (*Id.* at 27); *Friedman*, 837 F.2d at 50 ("Friedman apparently took no steps to leave the jurisdiction after federal agents executed a search warrant at his home . . . ."); *United States v. Alfaro*, No. 15-CR-143, 2016 WL 4708514, at *4 (W.D.N.Y. Sept. 9, 2016) ("[T]he fact that Alfaro has known of potential, serious criminal charges against him for almost a year and has not run weighs in favor of his release.").

In a similar vein, the Government will say that Mr. Fox now fully appreciates the strength of the case against him. But reasonable minds can differ about the strength of a case, and what matters is the defense's opinion. *See, e.g.*, *United States v. Hill*, No. 10-CR-00191-A, 2011 WL 5403276, at *1, 7 (W.D.N.Y. Nov. 7, 2011) (reviewing the strength of the proof on the premise that a defendant who believes he will be convicted at trial has less to lose by fleeing), *aff'd*, 462 F. App'x 125 (2d Cir. 2012). We were skeptical of the Government's case as we understood it during the detention proceedings, and the more we investigate the Government's allegations the more skeptical we become.

Our reasons for skepticism as to Counts 1 and 2 of the Criminal Complaint are set forth above. *See supra* § I.B. In addition to those charges, the Government proffered that several escorts claim to have been raped by Mr. Fox and told Judge Roemer that Mr. Fox confessed to rape during his post-arrest interviews. (Hrg. 1 Tr. at 7-8.) Thus, when defense counsel stated that Mr. Fox "absolutely denies raping anyone" Judge Roemer replied that counsel's assertion "seems to be directly contrary to what the government has represented that he said during these interviews." (*Id*. at 20.) Judge Roemer continued the detention hearing largely to resolve this dispute. (*Id*. at 38, 41-42.)

The continued detention hearing established that the Government had misstated the proof. The passages the Government called "confessions" were simply Mr. Fox questioning whether a person is acting of her own free will when her addiction and other life circumstances cause her to *voluntarily* do things she would not otherwise do. (Interview 2 at 40:49-41:25, 1:01:00-1:02:13.) Whatever the philosophers would say about this question, the criminal law clearly holds that voluntary acts are no less voluntary for being influenced by addiction. *See, e.g.*, *United States v. Morrissey*, 461 F.2d 666, 667 (2d Cir. 1972) (describing the "overwhelming" guilt of a drug addict who "determined to rob a bank to get money to pay for drugs"). Consensual sex that one of the participants might, under different circumstances, have chosen to decline is not rape.

This distinction is as clear in Mr. Fox's mind as it is established in the criminal law. When Mr. Fox was asked directly whether he has ever had non-consensual sex with anyone, he repeatedly and unequivocally said "no":

Examiner: Did you ever rape a girl?

Mr. Fox: No.

Examiner: Never?

Mr. Fox: No, never.

Examiner: So, I mean, as we get into the questions on

the exam, like, you're 100% confident that . . . .

Mr. Fox: 100%.

(Interview 2 at 1:09:25-1:09:36; *see also* Interview 1 at 28:30-29:12 (Mr. Fox stating that he has only ever had consensual sex); Interview 2 at 40:49-40:58 ("I'm into some kinky stuff, but all of it has to have consent."); *id*. at 57:36 (Mr. Fox stating his preference for "[r]ole play of like BDSM stuff. I'm dominant. They're submissive. But consensual."); *id*. at 1:00:50 (Mr. Fox stating that every sexual act he has ever done with anyone is "100% consensual"); *id*. at 1:24:50 (Mr. Fox denying that he has ever had non-consensual sex).)

Mr. Fox then submitted to a polygraph examination in which he was asked, on four separate occasions, whether he had ever had non-consensual sex with anyone and whether he had ever had non-consensual sex with anyone in his home. (Interview 2 at 1:42:38-1:43:17; *id*. at 1:50:55-1:51:35; *id*. at 1:58:30-1:59:14; *id*. at 2:07:29-2:08:11.) Mr. Fox answered "no" each time. (*Id*.) And the polygraph examiner who scored the results judged his denials free of deception. (Hoover Decl., Ex. E at 3.)

Had the polygraph indicated deception, the Government would have trumpeted the result. Because it did not, the Government will say the only thing that matters is the interview that took place before the examination. (Hrg. 2 Tr. at 4-5, 20, 42.) But if the polygraph was just a ruse used to elicit statements from Mr. Fox, there would be no reason for the Government to have the results scored by someone at "another facility in a different state" who "doesn't know the facts of the case" (Hrg. 1 Tr. at 40-41). The reason the Government takes this precaution is because it believes in polygraphs and wants the most accurate result possible. And indeed, while there is good reason to question a claim that a polygraph examination has *detected* deception (as opposed to fear, stress, anger, and so on), negative results like the one before the Court are far more reliable. *See, e.g.*, Michael D. Morgan, *Lying in the Heartland: Problems and Solutions Regarding Polygraph Evidence in Ohio Criminal Procedure*, 26 Ohio N.U. L. Rev. 89, 114 (2000) ("[M]ost polygraph studies show that 'false positives' are far

more common than 'false negatives' . . . ."); *accord* Melissa Hamilton, *Briefing the Supreme Court: Promoting Science or Myth?*, 67 EMORY L.J. ONLINE 2021, 2033 (2017); *see also* U.S. Justice Manual § 9-13.300, 2020 WL 1702450, at *1 (supporting the use of polygraphs for investigative purposes, and articulating concerns about false positives but not false negatives).

Of course, notwithstanding the polygraph results, the Government will maintain that it believes the accusers. But the discovery we have received since the detention hearings, along with information we have developed through our independent investigation, raises deadly serious questions about the accusers' veracity. There is no documentary corroboration of these accusations, and the contemporaneous documents we have obtained undermine the Government's allegations. *Compare United States v. Maxwell*, 510 F. Supp. 3d 165, 172 (S.D.N.Y. 2020) (finding the Government's evidence compelling in part because the main witnesses' sex-trafficking allegations were supported by "flight records and other witnesses' corroborating testimony"). And in any event, the issue here is whether Mr. Fox will flee. He knows in his own mind that no rape ever occurred and that the evidence will ultimately bear this out. The polygraph report speaks to the genuineness of his conviction, and the limited investigation we have performed to date tends to support his denials. These accusations, heinous as they are, do not present an insuperable risk of flight.

Finally, if the detention hearings are any guide, the Court can expect that the Government's understandable but misapplied condemnations of non-consensual sex will frequently devolve into pearl-clutching hysterics over sex toys and BDSM. The sex furniture the Government calls a "torture device" designed to facilitate rape (Hrg. 1 Tr. at 13) actually reflects a common, standard element of BDSM practice, *see, e.g.*, Neef et al., 7 SEXUAL MEDICINE at 134 (describing physical restraint as one of the milder and more common elements of BDSM practice); Tanya Bezreh et al., *BDSM Disclosure and Stigma Management: Identifying Opportunities for Sex Education*, 7 AM. J. SEXUALITY EDUC. 37, 37 (2012) (identifying "bondage" as a common BDSM practice). The photos

that Government counsel described as among the most shocking he had ever seen (Hrg. 2 Tr. at 19) depict consensual sexual encounters between Mr. Fox and Ms. Dellavalle, all of which were conceived by Ms. Dellavalle herself. (Hoover Decl., Ex. G.) Perhaps the Government's representatives disapprove of BDSM and sex toys, but the only line the law draws is the one dividing consensual sex from non-consensual sex. Mr. Fox has never raped anyone. Moralizing harangues equating BDSM sex with "violent sexual devian[cy]" (Hrg. 2 Tr. at 12[7]) belong to a bygone era best left where it lies, *compare, e.g.*, *Boutilier v. Immigr. & Naturalization Serv.*, 387 U.S. 118, 120-21 (1967) (approving the exclusion of homosexuals from the United States on the theory that the relevant statutory phrase "psychopathic personality" included "sex perverts" and "sexual deviates" (quotation marks omitted)); *Ginzburg v. United States*, 383 U.S. 463, 489 (1966) (Douglas, J., dissenting) (discussing "deviant" sexual appetites like "[m]asochism and "homosexual[ity]"); *Loving v. Commonwealth*, 206 Va. 924, 929-30 (1966) (upholding the criminal convictions of a white man and a Black woman who "cohabitat[ed] as man and wife" in violation of "miscegenation statute[]"), *rev'd sub nom.*, *Loving v. Virginia*, 388 U.S. 1 (1967); *see also* Neef et al., 7 SEXUAL MEDICINE at 129-31, 134-36 (contrasting the 19th Century inclination to pathologize BDSM preferences with the modern understanding of their origins and prevalence); Bezreh et al., 7 AM. J. SEXUALITY EDUC. at 38-42, 57 (comparing the stigmatization experienced by gay and lesbian youths to the stigmatization experienced by those with a preference for BDSM).

The Government has also suggested that Mr. Fox could be charged with drug trafficking that causes "serious bodily injury," 21 U.S.C. § 841(b)(1)(C), citing two instances in which women overdosed at Mr. Fox's residence and were revived with

---

[7]      (*See also* Hrg. 1 Tr. at 17-18 ("deviant sexual purposes"); *id.* at 9 ("extreme sex acts"); *id.* at 18 ("extreme sex acts and essentially rape"); Hrg. 2 Tr. at 3 ("deviant sexual activity"); *id.* at 22 ("deviant, horrific sexual activity"); *id.* at 24 ("deviant sexual pleasures").)

Narcan (naloxone). To sustain such a charge, the Government would have to prove that Mr. Fox sold drugs to the women who overdosed, that those women suffered a serious bodily injury, and that the injury would not have occurred but for the drugs they bought from Mr. Fox. *See Burrage v. United States*, 571 U.S. 204, 211, 218-19 (2014). We do not see how the Government can prove these elements.

During the first detention hearing, the Government again mischaracterized Mr. Fox's post-arrest statements, claiming: "The defendant admitted during this videotaped interview that on two different [occasions] when *he supplied* heroin to prostitutes, it *caused* them to overdose. This is *corroborated* by a 911 call and police reports regarding one of the overdoses." (Hrg. 1 Tr. at 6 (emphasis added).) In truth, all Mr. Fox said is that, on two occasions, he treated women with Narcan. (Interview 2 at 1:07:25-1:08:38.) He never said that he supplied those women with heroin, much less that the heroin he supplied caused them to overdose.

Nor is it true, we have recently discovered, that the Government's investigation corroborates the statements made to Judge Roemer. One of the women who overdosed told the Government that Mr. Fox did *not* give her the narcotics she took immediately before she became ill. (Hoover Decl. ¶ 8.) As for the other woman, on the 911 call the Government cited during the detention hearings (but did not play or make available), Mr. Fox expresses uncertainty as to whether the woman had used heroin (*id*., Ex. D), suggesting that he did not supply her with narcotics.

Separate and apart from the question of supply, "[a]ddicts often take drugs in combination," *Burrage*, 571 U.S. at 214. Here, unlike many overdose cases, there is no toxicological evidence to show what caused these two overdoses.

We expect that the Government is more bullish on its case than we are. But for purposes of assessing flight risk, what matters is Mr. Fox's perspective. In our view, the current and potential charges against Mr. Fox all have serious infirmities. While it may be reasonable to take precautions against flight, it is not reasonable to say that only detention will likely assure his appearance.

The precautions that Mr. Fox and the Probation Office have proposed are substantial. As discussed above, Mr. Fox will submit to home detention and electronic monitoring, allowing the Probation Office to verify his location at all times. He will also submit to Internet monitoring, making a successful flight extremely difficult. He will also post his home and property, along with his parents' house. The combined equity in those two properties is at least $300,000, and likely much more. (Hoover Decl. ¶¶ 22-23.) These properties would be forfeited not only if Mr. Fox flees (which he won't) but also if he violates any condition of his release.

In addition, Mr. Fox's father is willing to act as a third-party custodian. Such arrangements are provided for in the Bail Reform Act, *see* 18 U.S.C. § 3142(c)(1)(B)(i), and have been successfully employed in this district, *see Enix*, 209 F. Supp. 3d at 577. Don and Amy Fox live less than 15 minutes from their son's house, and Don Fox has pledged, on top of all the usual terms of custodianship, to physically check in on his son multiple times each day.

Neither the Government nor Judge Roemer addressed the safeguards proposed by Mr. Fox and the Probation Office. Particularly in light of Mr. Fox's history and personal characteristics, his ties to the community, and his investment in his defense, these safeguards amply address any risk of flight.

### III. THE GOVERNMENT DID NOT AND CANNOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE SAFETY OF THE COMMUNITY.

During the detention hearing, the Government made much of the fact that Mr. Fox had a shotgun and other weapons in his house. (Hrg 1 Tr. at 5-6, 9.) But none of these weapons are illegal, there is no suggestion that Mr. Fox has ever tried to hurt anyone with them, and in any event these weapons have now been removed from the residence.

At this point, the only potential safety issue stems from the Government's heinous (and false) accusations regarding Mr. Fox's interactions with escorts. And there

is *no* evidence that Mr. Fox has seen a single escort since he began dating Rachel Dellavalle in or around September 2020 (Interview 2 at 51:30). During the detention hearing, the Government presented some evidence suggesting that Mr. Fox may have searched or called escorts' phone numbers in January 2022. (Hrg. 2 Tr. at 6-8, 11.) But there is no proof that he actually saw an escort after September 2020. And indeed, that is the only conclusion consistent with the Government's theory of the case. Again, the Government alleges that Mr. Fox used the promise of drugs to coerce escorts into having sex, and that he kept drugs in his home to "fund" these transactions. Yet when the Government surveilled his residence from December 2021 to February 2022, it found no evidence of drug activity, no evidence of escort activity, and no evidence of any other illegality. Likewise, when agents searched Mr. Fox's residence on February 3, 2022—shortly after the Internet searches that the Government cited to Judge Roemer—they found no drugs, no drug paraphernalia, no drug residue, and no one present in the home other than Mr. Fox and Ms. Dellavalle.

Moreover, neither the Government nor Judge Roemer have explained why the proposed conditions of release would not reasonably ameliorate any potential safety issue. As noted above, Mr. Fox will submit to home detention and electronic monitoring, ensuring that he will not leave his house to visit escorts (or anyone else). He will also submit to Internet monitoring, ensuring that he does not arrange for escorts to visit his residence. The Government can also maintain the pole camera it has already installed outside his residence, ensuring that it will know who comes and goes from his residence. Mr. Fox's father will act as custodian and check in on him multiple times each day. And Mr. Fox will know that any attempt to contact escorts would result in his being detained, and his and his parents' homes being forfeited. These comprehensive conditions neutralize the only potential safety issue that exists.

## IV.   PRETRIAL DETENTION HAMPERS MR. FOX'S ABILITY TO PARTICIPATE IN HIS DEFENSE.

The Sixth Amendment right to the effective assistance of counsel necessarily assumes the ability to confer with counsel. As the Second Circuit recently held:

> The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system.

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 134 (2d Cir. 2020).

In addition to the reasons for release set forth above, the Court should consider the degree to which detention will hamper Mr. Fox's ability to participate in his defense. Detention, particularly in the age of COVID, limits a defendant's contact with his attorneys, straining the attorney-client relationship and eroding the defendant's ability to participate in his defense. This problem is particularly acute here, because the discovery the Government has provided is voluminous (it was provided on a two-terabyte hard-drive), it is almost entirely electronic, and some of it consists of video or audio files that cannot be printed. Moreover, the Government is insisting that Mr. Fox be allowed to review the discovery only in the presence of defense counsel. (Hoover Decl. ¶¶ 26-28.) If Mr. Fox were released, he could confer with defense counsel as needed and review discovery in counsel's office, allowing him to meaningfully participate in his own defense while accommodating whatever legitimate concerns the Government has. For this reason too, Mr. Fox should be released on conditions.

## CONCLUSION

Following briefing and argument, the Court should issue an order denying the Government's motion for detention and releasing Mr. Fox on conditions.

Dated:   Buffalo, New York
            March 30, 2022

                                    Respectfully submitted,

                                    **HOOVER & DURLAND LLP**
                                    *Attorneys for Defendant-Appellant James P.*
                                    *Fox*

                                    By:  s/Timothy W. Hoover
                                           Timothy W. Hoover
                                           Spencer L. Durland
                                    561 Franklin Street
                                    Buffalo, New York 14202
                                    Telephone: (716) 800-2604
                                    *thoover@hooverdurland.com*
                                    *sdurland@hooverdurland.com*